Exhibit "G" Confrontation Clause

Motion to suppress pg.45,46,68,69

Appeal Court of the Eleventh Circuit opinon pg.4,15

S. H

```
 1        THE COURT: How much?
 2        THE WITNESS: I'm not sure of the total. I thought it
 3   was over two ounces of crack cocaine.
 4   Q. Where did you find it in the residence?
 5   A. There was a back bedroom. I think Agent Spear actually
 6   found the crack cocaine. There was a computer desk, and it was
 7   in a white plastic bag up -- up in a drawer up under the
 8   computer desk.
 9   Q. If you recall, was Ms. Hawk present in the residence when
10   the drugs were found or the guns were found?
11   A. Yes. She was at the residence when the drugs --
12   Q. Was she in the residence?
13   A. Yes.
14   Q. Okay. Did Ms. Hawk make any other statements to law
15   enforcement about her knowledge of either the guns or the drug
16   evidence located?
17   A. I basically remember her saying that her and Mr. Jefferson
18   were having problem -- marital problems because of his drug
19   dealing and that they were separated for some time and they we
20   trying to work things out.
21   Q. Do you remember her saying anything or indicating her
22   knowledge of the guns?
23   A. I believe she stated that she had bought the guns from an a
24   in the newspaper or something to that effect.
25   Q. Do you recall if she said for what purpose she bought the
```

S.H.

1  guns?
2  A.  I think Agent Whitten asked her about the guns, and she
3  stated that Wendall couldn't -- Mr. Jefferson couldn't buy them
4  because he was a convicted felon.
5  Q.  You had indicated that it was your -- that you remembered
6  that Ms. Hawk had said that they had been -- she and
7  Mr. Jefferson had been separated; is that correct?
8  A.  Yes, ma'am.
9  Q.  Do you recall if Ms. Hawk in any way indicated that
10 Mr. Jefferson resided at that house or who resided at the
11 residence?
12 A.  She stated they were trying to get back together and they
13 were both back at the residence.  I remember when we went to
14 residence, there was -- there were -- there was a Christmas t
15 and a bunch of Christmas presents and baby items.  And I bel
16 when -- I remember when we went in, there was a video game,
17 Playstation II video game, that was still going when we got
18 there.
19 Q.  Was anybody at the residence when you arrived?
20 A.  No, ma'am.
21 Q.  And you had indicated that there were some baby items.
22 you know whether or not Mr. Jefferson and Ms. Hawk have a
23 A.  That's one reason she stated that they were trying to
24 things work out, because they did have a child together.
25 Q.  Was it a baby?  Do you know?

S. H.

1  front of Head to Toe?

2  A. Yeah. The second handicapped.

3  Q. Would that have been pretty near to where her car was,

4  within five or six feet of her car?

5  A. Yes, ma'am.

6      MS. REDMOND: Nothing further.

7      THE COURT: Any redirect?

8      MS. COOPER: No, Your Honor.

9      THE COURT: You may be excused. You may remain in the

10 courtroom or leave.

11     Next witness.

12     MS. COOPER: Your Honor, I would call Jennifer Hawk. I

13 would make a motion to the Court, Judge, to limit her testimony

14 to the issues of consent regarding the search. Ms. Hawk is a

15 defendant in the Circuit Court of Russell County on charges

16 similar in nature arising out of the same set of facts and

17 circumstances as this case.

18     MS. REDMOND: In addition, Your Honor, I might add that

19 there is a possibility that Ms. Hawk will be added to a

20 superseding indictment as a coconspirator. Yes, ma'am. I

21 thought I should tell the Court.

22     THE COURT: How sure are you that she's going to be

23 added? Do you have plans to add her?

24     MS. REDMOND: At this point, yes, ma'am, on the June

25 15th --

S. H

1  THE COURT: Well, then she shouldn't testify.

2  MS. REDMOND: -- grand jury.

3  THE COURT: She should not testify. Her counsel is not
4  here.

5  MS. COOPER: Your Honor, I represent her in Circuit
6  Court of Russell County.

7  THE COURT: But you won't be able to represent her
8  here.

9  MS. COOPER: Yes, ma'am. I understand. I just wanted
10 the Court to know that. And I did receive an advisory opinion
11 from the Bar before I undertook that.

12 THE COURT: Because you will not be able to represent
13 her here, Ms. Hawk's interests as a potential defendant in this
14 court are not protected and the Court can't permit her to
15 testify. She's a likely codefendant of Mr. Jefferson. I don't
16 know how it could be limited in a way that both protects her
17 Fifth Amendment rights and protects her Sixth Amendment rights
18 There would always be room for counsel later to object -- that
19 is, her counsel -- and I'm not going to put -- I'm not going t
20 create that risk.

21 MS. COOPER: Based upon that, Your Honor, we would
22 rest.

23 THE COURT: Anything further from the government?

24 MS. REDMOND: No, ma'am. No further witnesses to be
25 called.

Prior to sentencing, a probation officer prepared a presentence investigation report ("PSI"), which included, in relevant part, that, as part of an undercover investigation, law enforcement agents learned that Jefferson was using his wife's business, "Head to Toe Studios," to store, process, and sell cocaine base. As part of a consensual search of this business, the agents recovered a 9mm pistol loaded with two 30 round magazines under the front desk, and three plastic bags containing suspected cocaine residue in the trash can in the rear of the business. Moreover, as part of a same-day consensual search of the residence shared by Jefferson and Hawk, the agents recovered a loaded 9mm semiautomatic assault weapon with an extra 32-round magazine next to it, a double barrel 20-gauge shotgun, and a clear plastic bag containing 56.9 grams of cocaine base. Hawk told an agent that she purchased these firearms for Jefferson's benefit, because he was a convicted felon.[1]

Based on these facts, the probation officer calculated Jefferson's total offense level as 29, his criminal history as III, and his resulting guideline range as 108 to 135 months' imprisonment. The probation officer, however, noted that, pursuant to U.S.S.G. § 2K2.4, the guideline sentences for Counts 4 and 6 were

---

[1] The prosecutor testified at a hearing on Jefferson's suppression motion that, until Jefferson executed his plea agreement, the government intended to charge Hawk for her criminal conduct of purchasing these firearms.

4

To the extent Jefferson is asserting that the court should have granted his motion to withdraw his plea because his plea was coerced by the government's threat to prosecute his wife, he informed the court during his reaffirmation of his plea at his sentencing hearing that he had been motivated by the government's threat to indict his wife for the same conduct. Nevertheless, Jefferson advised the court that he understood he could withdraw his plea and proceed to trial, and that he still wished to plead guilty. Thus, we review this claim only for plain error. See Monroe, 353 F.3d at 1349.

Here, the parties' plea agreement reflects that the government threatened to prosecute Jefferson's wife if he did not plead guilty; thus, Jefferson has the burden of showing that the government did not observe a "high standard of good faith," based upon probable cause to believe that the third party had committed a crime. See Martin, 760 F.2d at 1247-48. However, prior to plea negotiations, the government knew that the drugs and firearms were recovered from Jefferson's wife's business and the residence she shared with Jefferson. Moreover, Jefferson's wife informed law enforcement officers that she purchased these firearms. The prosecutor also testified that, before Jefferson executed his plea agreement, it intended to charge his girlfriend for her criminal conduct of purchasing these firearms. Accordingly, the record shows that the threats by law

15