United States of America v. Wendall Jefferson                    May 29, 2003

1

```
 1                  IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE MIDDLE DISTRICT OF ALABAMA

 3                          EASTERN DIVISION

 4

 5   UNITED STATES OF AMERICA

 6       vs.                        CR. NO. 03-63-E

 7   WENDALL JEFFERSON,

 8           Defendant.

 9

10

11

12                  * * * * * * * * * * *

13               HEARING ON MOTION TO SUPPRESS

14                  * * * * * * * * * * *

15        BEFORE THE HONORABLE VANZETTA PENN McPHERSON, UNITED

16   STATES MAGISTRATE JUDGE, at Montgomery, Alabama, on Thursday,

17   May 29, 2003, commencing at 9:00 a.m.

18   APPEARANCES:

19   FOR THE GOVERNMENT:     Ms. Susan R. Redmond
                             Mr. Verne H. Speirs, II
20                           Assistant United States Attorneys
                             OFFICE OF THE UNITED STATES ATTORNEY
21                           One Court Square, Suite 201
                             Montgomery, Alabama   36104
22
     FOR THE DEFENDANT:      Ms. Connie Jo Cooper, Attorney at Law
23                           1208 Broad Street, Suite 207
                             Phenix City, Alabama   36867
24
                 Proceedings reported stenographically;
25               transcript produced by computer.
```

United States of America v. Wendall Jefferson                                May 29, 2003

                                                                                    2

1                        EXAMINATION INDEX
    DAVID JASON WHITTEN
2        DIRECT BY MS. REDMOND                    9
         CROSS BY MS. COOPER                      25
3
    JAMES PRICE
4        DIRECT BY MS. REDMOND                    38
         CROSS BY MS. COOPER                      47
5
    ANDREA JOHNSON
6        DIRECT BY MS. COOPER                     52
         CROSS BY MS. REDMOND                     57
7
    TOWANNA LEWIS
8        DIRECT BY MS. COOPER                     59
         CROSS BY MS. REDMOND                     64
9
10                    * * * * * * * * * *
11      (The following proceedings were heard before the Honorable
12       Vanzetta Penn McPherson, United States Magistrate Judge, at
13       Montgomery, Alabama, on Thursday, May 29, 2003, commencing
14       at 9:00 a.m.:)
15      (Call to Order of the Court)
16          THE COURT:  United States of America versus Wendall
17   Jefferson, Case Number 03-63-E.  This proceeding is an
18   evidentiary hearing on the defendant's motion to suppress
19   evidence in this criminal felony case.
20          Counsel, first of all, let me thank you for your
21   willingness to accommodate my need to reschedule today's
22   hearing.
23          Is the government ready to proceed?
24          MS. REDMOND:  Yes, ma'am.
25          THE COURT:  And is the defendant ready to proceed?

United States of America v. Wendall Jefferson                                    May 29, 2003

---

3

1    MS. COOPER: Yes, Your Honor.
2        THE COURT: The defendant's motion for suppression of
3    the evidence of a stop which occurred on 6 December 2002 was
4    filed on 14 May 2003. The government's response was filed on 23
5    May 2003. The defendant grounds his motion on unreasonableness
6    of the stop and the search without a warrant. The defendant
7    alleges that the officer had no probable cause to stop him.
8        How many persons are expected to testify as witnesses?
9        MS. REDMOND: For the government, we intend on calling
10   two witnesses, Your Honor.
11       THE COURT: And Ms. Cooper?
12       MS. COOPER: Your Honor, I have three witnesses.
13       THE COURT: All persons who expect to testify as
14   witnesses, please approach the bar here in front of the bench,
15   raise your right hands to be sworn.
16       (Off-the-record discussion)
17       THE CLERK: Would all witnesses please come to the
18   courtroom? They're in the back. She's got -- her witnesses are
19   in the conference room. If y'all will come forward up here,
20   please, we're going to swear you in.
21       (Prospective witnesses are sworn)
22       THE CLERK: Thank you. Y'all may return to the room,
23   please. Thank you.
24       THE COURT: Ms. Redmond.
25       MS. REDMOND: Your Honor, before we begin, the

---

4

1    government would renew its motion under United States v.
2    Richardson in that in the defendant's motion to suppress, the
3    defendant admits that he was not in fact stopped, that he
4    voluntarily had stopped his vehicle and removed himself from his
5    vehicle. In addition, the government would argue that the
6    search of the vehicle, the business, and the home was given --
7    was done pursuant to consent to search given by Jennifer Hawk,
8    who was the wife -- or who is the wife of the defendant, and who
9    also has a proprietary interest in all of those -- both the
10   business, the house, and the vehicle, and that any statements
11   made by the defendant were made not under interrogation but were
12   made -- were spontaneous statements against interest.
13       THE COURT: Let's establish some facts, then, based
14   upon the government's motion.
15       Ms. Cooper, is there any factual dispute regarding
16   Mr. Jefferson's wife's proprietary interest in the car? Does
17   she have a proprietary interest in the car?
18       MS. COOPER: Actually, Your Honor, it's my
19   understanding that the vehicle in which the original contraband
20   was located is the property of Ms. Hawk's grandmother and was at
21   the time of the arrest.
22       THE COURT: That is to say it was registered in the
23   name of Ms. Hawk's grandmother.
24       MS. COOPER: Yes, ma'am.
25       THE COURT: So the defendant himself had at the time no

---

5

1    proprietary interest in the vehicle.
2        MS. COOPER: That's correct, Your Honor. He was
3    driving the vehicle shortly before the investigatory stop.
4        THE COURT: Is there any factual dispute that the
5    investigatory stop occurred after the defendant exited the
6    vehicle?
7        MS. COOPER: It is my belief, Your Honor, that the
8    defendant was en route from the business known as Head to Toe
9    back -- walking back to his vehicle when the investigatory stop
10   took place.
11       THE COURT: So you agree that the investigatory stop
12   occurred outside the vehicle and outside a building.
13       MS. COOPER: It was outside the building, Your Honor.
14   It's my belief Ms. Hawk was already in her vehicle --
15       THE COURT: I understand that. Here's what I'm asking
16   you. Did the investigatory stop occur while Mr. Jefferson was
17   outside of the vehicle?
18       MS. COOPER: Yes, ma'am, I believe so.
19       THE COURT: Okay.
20       MS. COOPER: If it please the Court, may I speak?
21       THE COURT: Yes.
22       MS. COOPER: Your Honor, based upon my analysis of the
23   case and the investigatory stop, I believe that there are three
24   issues before the Court. Mr. Jefferson respectfully submits
25   that the investigatory stop of his person was illegal, not based

---

6

1    upon any reasonable suspicion that criminal activity was afoot.
2    Judge, it's my belief that based on an investigatory stop that
3    is illegal, if the Court finds that to be a fact beyond a
4    preponderance of the evidence, at that point, Judge, I believe
5    the analysis can stop. And according to the fruit of the
6    poisonous tree, all illegal substances found would at that time
7    be allowed to be suppressed. If the Court finds that the
8    analysis needs to continue past the investigatory stop, it is my
9    belief that the second issue arises in that we believe there was
10   no valid consent to search the vehicle where the initial
11   contraband was found. Additionally, Judge, if that particular
12   analysis needs to go further from that point, we believe that
13   the written consent that followed to search the business and the
14   homeplace was also not valid but was the product of coercion and
15   duress. And we believe that through the evidence, that will be
16   proven to the Court today.
17       THE COURT: Thank you.
18       MS. REDMOND: Your Honor, if I may?
19       THE COURT: Ms. Redmond.
20       MS. REDMOND: Of course, the government's argument
21   would be, number one, there was no investigatory stop. The
22   defendant parked his vehicle, left his vehicle, was returning
23   when officers approached, which rises to nothing more than a
24   consensual encounter. It is at that point that Ms. Hawk, who is
25   in the vehicle in which the contraband was located, removes

---

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

United States of America v. Wendall Jefferson                                              May 29, 2003

7

1   herself voluntarily and makes contact with one of the agents --
2   and that would be Agent Price -- and gives consent, oral
3   consent, to search that vehicle so that there is no
4   investigatory stop of Mr. Jefferson and that nothing out of the
5   contact made with Mr. Jefferson triggers the search. It is
6   simply the consent to search given by Ms. Hawk that triggers the
7   initial search of the vehicle.
8        The government does concede that once that vehicle is
9   searched, all of the subjects present, including -- to include
10  Ms. Hawk, Mr. Jefferson, and a second female, are placed under
11  arrest. And after Ms. Hawk is mirandized, she gives consent to
12  search the -- and that's a written consent to search -- of the
13  business located on Martin Luther King -- I believe it's Parkway
14  and the residence and in fact gives the address of residence
15  to search.
16       MS. COOPER: Your Honor, I don't mean to --
17       THE COURT: I'm not going to hear any more argument.
18  We're going to proceed. I have some difficulty, Ms. Cooper,
19  with the defendant's ability to overcome the hurdle created by
20  these three things. One, the stop occurred while he was
21  outside --
22       (Brief interruption)
23       THE COURT: The cord is so short.
24       In any case, I have some difficulty understanding how
25  the defendant will overcome these three hurdles. Number one,

8

1   the stop occurred while he was outside both the building and the
2   vehicle. And I know that there was no search of the building,
3   but that the stop occurred while he was outside, that he was not
4   asked by or coerced by any officer to leave the vehicle. Number
5   two, that the vehicle that was searched did not belong to the
6   defendant. Therefore, I have some concern about the defendant's
7   standing to challenge a search of a vehicle in which he has no
8   proprietary interest and from which he was not forcibly
9   removed. Number three, I have some concern about the
10  defendant's standing to challenge consent given to the search by
11  one who was a passenger in the vehicle and whose grandmother
12  owned the vehicle. So those are the hurdles that I -- that the
13  Court has some difficulty understanding how the defendant will
14  overcome. So I would appreciate it if you, all of you, would
15  focus the testimony in those areas, because that's where the
16  Court is really thinking about. Thank you.
17       Proceed, Ms. Redmond.
18       MS. REDMOND: The government calls Agent Jason Whitten.
19       THE CLERK: Whitten?
20       MS. REDMOND: Whitten.
21       THE COURT: Would you spell --
22       THE CLERK: Jason Whitten, please come to the
23  courtroom.
24       THE COURT: Ms. Redmond, please spell his name.
25       MS. REDMOND: I'm sorry. W-H-I-T-T-E-N.

9

1        THE COURT: Proceed.
2        DAVID JASON WHITTEN, the witness, having been
3   previously sworn, testified, as follows:
4             DIRECT EXAMINATION
5   BY MS. REDMOND:
6   Q. Would you state your full name and place of employment?
7   A. Sergeant David Jason Whitten. I'm employed by the Phenix
8   City Police Department.
9   Q. Is that Phenix City, Alabama?
10  A. Yes, ma'am. Phenix City, Alabama.
11  Q. Is Phenix City Alabama within the Middle District of
12  Alabama?
13  A. Yes, ma'am.
14  Q. And Agent Whitten, are you -- what do you do with the Phenix
15  City Police Department?
16  A. I'm currently assigned to the Metro Narcotics Task Force.
17  Q. What is the Metro Narcotics Task Force?
18  A. Metro Narcotics Task Force is a multijurisdictional task
19  force made up --
20  Q. Let me ask you this. Can you slow down a little bit? The
21  court reporter needs to take down everything you say.
22  A. Yes, ma'am. It is a multijurisdictional task force that is
23  made up of Phenix City Police Department; Russell County
24  Sheriff's Department, Alabama; Muscogee County Sheriff's
25  Department --

10

1   Q. Would you spell that, please, if you can?
2   A. M-U-S-C-O-K-E --
3        THE COURT: G. G-E. Muscogee.
4        THE WITNESS: Yes, ma'am.
5        THE COURT: Where Columbus is located?
6        THE WITNESS: Yes, ma'am.
7   A. -- Columbus Police Department, which is also in Georgia;
8   Harris County Police -- Sheriff's Department, which is also in
9   Georgia.
10  Q. Is there anyone else?
11  A. No, ma'am.
12  Q. All right.
13  A. And we work middle- to upper-level narcotic and vice
14  investigations.
15  Q. In December of 2002, were you involved in an investigation
16  which had as its focus a person named Wendall Jefferson?
17  A. Yes, ma'am.
18  Q. And on or about December 6th, did you make contact with
19  Mr. Jefferson?
20  A. Yes, ma'am.
21  Q. How did that come about? And if you could, would you start
22  from your first action on December 6th?
23  A. Myself and other agents from the Metro Narcotics Task Force
24  were in the area of 431 South, which is also known as Martin
25  Luther King Parkway in Phenix City, Russell County, Alabama. We

4 (Pages 7 to 10)

United States of America v. Wendall Jefferson                                          May 29, 2003

11

1   were conducting surveillance in the parking lot of a strip mall,
2   and this strip mall contained a business which was known to us
3   as Head to Toe Studio.
4   Q. Why were you conducting surveillance on Head to Toe Studios?
5   A. We had received information that a subject by the name of
6   Wendall Jefferson was an owner of a business in that --
7       MS. COOPER: Objection, Your Honor. Although I realize
8   that hearsay is allowed in suppression hearings in federal
9   court, I believe that the hearsay needs to be shown to be
10  reliable.
11      MS. REDMOND: Judge, I think --
12      THE COURT: The objection is overruled.
13  Q. Continue, please.
14      THE COURT: He's stating the reason why he was there.
15      And Ms. Cooper, when you object or speak to the Court,
16  please stand.
17  Q. (Ms. Redmond, continuing:) Would you continue, please?
18  A. I had received information from several sources that
19  Mr. Jefferson was operating a business at this location and was
20  selling cocaine from the business.
21  Q. Are you aware or were aware at the time of whether or
22  not Mr. Jefferson was the sole owner of Head to Toe Studios?
23  A. At this time, no, ma'am.
24  Q. What, if anything, did you do on December 6th, 2002, in
25  relation to Head to Toe Studios and the investigation on

12

1   Mr. Jefferson?
2   A. Myself and the other agents were in an undercover police car
3   parked in the parking lot just observing the business and
4   observing activities going on in the business.
5   Q. About what time did you set up your surveillance?
6   A. It was approximately 8:30 at night, 8:20 at night.
7   Q. Is the area clearly lit?
8   A. Yes, ma'am.
9   Q. Could you see the business?
10  A. Yes, ma'am.
11  Q. Was the business -- did the business appear to be inhabited?
12  A. There were some lights on inside the business, but it didn't
13  appear to be open.
14  Q. What, if anything else, did you notice while you were
15  conducting surveillance about either Head to Toe studios or that
16  strip mall area?
17  A. On this particular night, what was different about it was
18  there was two individuals inside the business. All the other
19  times that we had set up surveillance on the business, there was
20  never any lights on and never no one inside the business.
21  Q. Did you make contact at that point with any of the
22  individuals in the business?
23  A. No, ma'am.
24  Q. Did you go into the business at all?
25  A. No, ma'am.

13

1   Q. How many agents were with you at that time?
2   A. There were myself and three others.
3   Q. And you had indicated to the Court that you were conducting
4   surveillance. How were you conducting surveillance?
5   A. We were just sitting in the vehicle watching the business.
6   Q. One vehicle?
7   A. Yes, ma'am.
8   Q. What, if anything, did you see on December 6th, 2002?
9   A. There were two females inside the business that appeared to
10  be pacing back and forth to the door and back to the business.
11  At one point, a -- one vehicle pulled in. Two subjects went to
12  the door and then went back into the rear of the business. They
13  appeared to be waiting on someone.
14  Q. What happened next?
15  A. We just continued to watch. And after about ten minutes, a
16  maroon Chevy vehicle, late-model vehicle, arrived at the
17  business.
18  Q. What occurred then?
19  A. A subject that I recognized as Wendall Jefferson exited the
20  vehicle and walked to the front door of the business. The two
21  females inside the business exited the vehicle (sic), and
22  Mr. Jefferson locked the door of the business.
23  Q. You had indicated that you recognized Mr. Jefferson; is that
24  correct?
25  A. Yes, ma'am.

14

1   Q. Have you had previous contact with Mr. Jefferson?
2   A. Yes, ma'am, I have.
3   Q. Is that actual contact, physical contact, you and
4   Mr. Jefferson know each other?
5   A. I had occasion to meet Mr. Jefferson some years back in
6   E. K. Garrett Apartments, which is in Phenix City, Alabama. And
7   I also had a recent photograph of Mr. Jefferson.
8       THE COURT: What were the circumstances under which you
9   previously encountered him?
10      THE WITNESS: Your Honor, if I remember correctly, it
11  was an alcohol offense where he was released to his mother in
12  E. K. Garrett Apartments, which is in Phenix City.
13      THE COURT: Was he a minor at the time?
14      THE WITNESS: Yes, ma'am. I believe he was a minor at
15  the time. I believe he resided in Barbour County at the time.
16  It was several years ago.
17      THE COURT: Thank you.
18  Q. (Ms. Redmond, continuing:) All right. You said that
19  Mr. Jefferson exited his vehicle, went up to the business, and
20  two females exited the business?
21  A. Yes, ma'am. And Mr. Jefferson locked the door.
22  Q. I'm unclear about this. Did you say earlier that you had
23  seen the two females inside the business and two other people
24  had come into the business?
25  A. No, ma'am.

5 (Pages 11 to 14)

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

United States of America v. Wendall Jefferson                                        May 29, 2003

15

1  Q. I'm sorry. All right. It was just the two females that
2  were in the business.
3  A. Yes, ma'am.
4  Q. All right. And they exited the business; is that correct?
5  A. Yes, ma'am.
6  Q. What did they do or what did you see them do?
7  A. Ms. Jefferson went to the driver's side -- I mean Ms. Hawk,
8  Mr. Jefferson's wife, went to the driver's side of the vehicle
9  that Mr. Jefferson arrived in.
10  Q. Okay. Where did the other female go?
11  A. She walked to a car that was parked next to this.
12  Q. Do you have a description of that vehicle?
13  A. I don't recall the kind of vehicle she was getting in, just
14  the one Ms. Hawk was getting in.
15  Q. What, if anything, did you see Mr. Jefferson do after he
16  locked the business?
17  A. He appeared to go to the -- he seemed like he was going to
18  walk to the passenger side of the same vehicle that he pulled up
19  in.
20  Q. That's the late-model Chevrolet --
21  A. Yes, ma'am.
22  Q. -- that Ms. Hawk had gotten into the driver's side?
23  A. Yes, ma'am.
24  Q. And did in fact get into the vehicle?
25  A. No, ma'am.

16

1  Q. What did he do?
2  A. He looked at our vehicle and observed us, changed his
3  direction, and started going across the parking lot to another
4  vehicle that was parked on the other side of the parking lot.
5  Q. Is that the vehicle that the second female got into or went
6  to?
7  A. No, ma'am. It was a third vehicle.
8  Q. All right. Let me go back for just a moment. Were you in a
9  marked vehicle?
10  A. No, ma'am.
11  Q. Would you describe to the Court the vehicle that you were
12  in?
13  A. It was a 2000 or 2001 white Ford Expedition.
14  Q. Did it have tinted windows?
15  A. I believe the rear windows of it were tinted. The front
16  windows weren't.
17  Q. How did -- I'm sorry.
18      THE COURT: I'm sorry.
19      MS. REDMOND: I'm sorry, Your Honor.
20      THE COURT: Please excuse me. Did you say you were in
21  a marked vehicle?
22      THE WITNESS: No, ma'am. We were in an unmarked
23  vehicle.
24  Q. In conducting your surveillance, would you tell the Court
25  which way your vehicle was positioned?

17

1  A. The parking lot has a row of parking spaces that face the
2  straight -- it's a straight strip mall, and there is a row of
3  parking facing the storefronts. Then across the parking lot
4  there is another parking -- another line of parking that is the
5  same direction, just the other side of the parking lot.
6      MS. REDMOND: Please excuse me, Your Honor. The
7  defense has a picture that I think might help illustrate what
8  the witness is speaking about.
9      (Brief pause)
10  Q. Agent Whitten, I have placed on the machine something that
11  has been -- an exhibit that's been marked as Plaintiff's Exhibit
12  #1, previously marked as Defendant's Exhibit #1, and ask you if
13  you recognize this exhibit.
14  A. Yes, ma'am.
15  Q. What is that, please?
16  A. That is the parking lot and strip mall that I mentioned
17  earlier.
18  Q. And if you can -- and I think you can use your finger to
19  circle. Would you circle the business that you were surveilling
20  that evening?
21      THE COURT: Hold on. Let's go off the record.
22  (Brief interruption)
23      THE COURT: Back on the record.
24  Q. Agent Whitten, I have placed an X over part of that exhibit
25  and ask you if you can identify that area that is marked by the

18

1  X.
2  A. Yes, ma'am.
3  Q. What is that area?
4  A. That is the businesses -- business that this incident
5  occurred at.
6  Q. And can you -- and by using this exhibit --
7      MS. REDMOND: And actually, let me go back one moment,
8  Your Honor. The government moves to have admitted into evidence
9  Plaintiff's Exhibit #1, which is also marked as Defendant's
10  Exhibit #1.
11      THE COURT: Let's call it Government's Exhibit #1.
12      MS. REDMOND: We'll call it Government's Exhibit #1,
13  Your Honor.
14      THE COURT: Any objection?
15      MS. COOPER: No objection.
16      THE COURT: Government's Exhibit #1 is admitted.
17  Q. (Ms. Redmond, continuing:) Agent Whitten, if you -- looking
18  at your screen, were you to the right or the left in setting up
19  surveillance -- or in surveilling this business -- of the
20  screen?
21  A. The business next to it is Blimpee's. Do you see that
22  business?
23  Q. Yes, sir.
24  A. Okay. The -- there's a row of parking that's facing the
25  building that's -- that runs parallel with the building, and

6 (Pages 15 to 18)

United States of America v. Wendall Jefferson                                        May 29, 2003

19

1  then there's another one to the rear of the parking lot that
2  faces and parallels the building.
3  Q. All right. If you would, look to the right side of your
4  screen. There appears to be at the far edge of the screen a
5  vehicle.
6  A. Uh-huh.
7  Q. Is that what you're talking about when you talked about the
8  back row of parking?
9  A. Yes, ma'am.
10 Q. All right. And you had mentioned Blimpee's. Where were
11 you -- were you on the back row or the second row in front of
12 Blimpee's surveilling the business?
13 A. Yes, ma'am. Approximately two parking spaces, over or
14 two parking places over.
15 Q. Agent Whitten, I see on the exhibit what appears to be an
16 electrical pole; is that correct?
17 A. Yes, ma'am.
18 Q. All right. You were -- were you two spaces over from that
19 pole?
20 A. Yes, ma'am.
21 Q. On that row that the pole sits on?
22 A. Yes, ma'am.
23 Q. Were you -- I'm going to mark this exhibit. With the
24 exception of it looking as though it were on the grass, is that
25 approximately the area that you were in when surveilling?

20

1  A. Yes, ma'am.
2  Q. All right. Where were you in the vehicle?
3  A. I was in the passenger side backseat.
4  Q. And I'd asked you before whether or not that area was
5  well-lit at the time you were out there. What was your response?
6  A. Yes, ma'am.
7  Q. Where was the vehicle that Ms. Hawk had entered in relation
8  and in terms of this exhibit? Can you give us an idea?
9  A. It was on the front row of parking, just to the -- if you're
10 looking at the picture, just to the right of the front door at
11 the left.
12 Q. I've placed an X. Would that X approximately mark --
13 A. Maybe a little bit more to the right, I believe, where the
14 parking spaces were, but basically right there.
15 Q. All right. You'd indicated that Mr. Jefferson, upon going
16 to the passenger side of the vehicle Ms. Hawk was in, appeared
17 to notice your vehicle; is that correct?
18 A. Yes, ma'am.
19 Q. What, if anything, did Mr. Jefferson do when it appeared he
20 noticed you-all sitting in the vehicle?
21 A. He walked across the parking lot to the other side of the
22 entrance, the same row that we were parked on, and approached a
23 vehicle that was parked on that side.
24 Q. Okay. So in the same row, the second row that you-all are
25 parked on, he walked over to a third vehicle?

21

1  A. Yes, ma'am.
2  Q. All right. Where was the second woman that exited the
3  business? You had indicated that she went to a second vehicle.
4  Where was that vehicle located?
5  A. It was parked next to the vehicle that Mr. Jefferson arrives
6  in -- arrived in.
7  Q. The one Ms. Hawk is now in.
8  A. Yes, ma'am.
9  Q. Okay. What happens when Mr. Jefferson -- what actions do
10 you take when Mr. Jefferson goes to this third vehicle?
11 A. At this point, based on him noticing us, we decided to
12 approach Mr. Jefferson and make contact with him.
13 Q. How were you dressed?
14 A. I was dressed in blue jeans, a T-shirt, and I had what we
15 refer to as a raid vest on that was clearly marked police and
16 metro narcotics.
17 Q. Did you say a ray vest?
18 A. Yes, ma'am.
19 Q. R-A-Y?
20 A. Raid.
21 Q. Raid vest. R-A-I-D?
22 A. Yes, ma'am.
23 Q. All right. And how many other officers were with you?
24 A. There were one -- there was four of us in the vehicle.
25 Myself and Agent Nemmo walked toward the older Chevy Caprice

22

1  that Mr. Jefferson was approaching.
2  Q. That's the third vehicle.
3  A. Yes, ma'am.
4  Q. All right. Did you have your weapons drawn?
5  A. No, ma'am.
6  Q. Okay. What, if anything, did you do in approaching
7  Mr. Jefferson?
8  A. Approached Mr. Jefferson and identified myself, asked -- was
9  going to speak to him about some information that we had that he
10 was involved in some narcotics being sold from that business and
11 from his vehicle.
12 Q. You said that that was your purpose. Did you have an
13 opportunity to have that discussion with him?
14 A. No, ma'am.
15 Q. Why?
16 A. As myself and Agent John Nemmo approached Mr. Jefferson,
17 Mr. Jefferson hurriedly attempted to make it to the rear of the
18 vehicle and was told to remove his hand from his pocket several
19 times.
20 Q. And did he comply with that?
21 A. Once he tried to make it to the rear of the vehicle, based
22 on information that I had received about Mr. Jefferson and for
23 officer safety, I did not let him make it to the rear of the
24 vehicle.
25 Q. What was your belief at that time?

7 (Pages 19 to 22)

United States of America v. Wendall Jefferson                                    May 29, 2003

---

23

1  A. That possibly he was going for a weapon or attempting to
2  run.
3  Q. All right. And what, if anything, did you do in terms of
4  Mr. Jefferson at that point?
5  A. Asked Mr. Jefferson to remove his hand from his pocket,
6  asked him if he had any weapons on his person. Agent Nemmo also
7  had asked him to remove his hands from his pockets. At one
8  point, asked Mr. Jefferson if he had any weapons and asked him
9  if we could pat him down for weapons. Once we attempted to do
10  this, Mr. Jefferson's entire body tensed up, and he shifted his
11  weight to one foot as if he was going to run.
12  Q. All right. And what, if anything, did you do at that point?
13  A. At the same time, Mr. Jefferson was looking over at the
14  vehicle he arrived in, which Ms. Hawk had entered. Agent Price
15  and Agent Johnson had made contact with her at that vehicle.
16  Mr. Jefferson continued looking over at that vehicle --
17  Q. Let me ask you this. Is this based on your own observance?
18  A. Yes, ma'am.
19  Q. Okay. Go ahead, please.
20  A. At one point, Mr. Jefferson made a comment about his wife
21  had nothing to do with this.
22  Q. Okay. Let me stop you for just a moment and go back. You
23  said that you and Agent Nemmo --
24  A. Yes, ma'am.
25  Q. Is that N-E-M-M-O?

---

24

1  A. Yes, ma'am.
2  Q. -- made contact with Mr. Jefferson?
3  A. Yes, ma'am.
4  Q. Or attempted to make contact with him.
5  A. Yes, ma'am.
6  Q. At the same time that you are attempting to make contact
7  with Mr. Jefferson, Agents Price and --
8  A. Howard Johnson.
9  Q. -- are attempting to make contact with Ms. Hawk; is that
10  correct?
11  A. Yes, ma'am.
12  Q. Okay. What's going on with the second female?
13  A. She had went to her vehicle. And I believe Agent Johnson
14  made contact with her while Agent Price made contact with
15  Ms. Hawk.
16  Q. Are you able or were you able to hear the -- what was going
17  on with Agent Price and Agent Johnson and the two individuals
18  they were making contact with?
19  A. No, ma'am.
20  Q. So you don't know independently of any conversations that
21  they were having at that time; is that correct?
22  A. No, ma'am.
23  Q. You had indicated that you had patted or attempted to pat
24  Mr. Jefferson down for officer safety; is that correct?
25  A. Yes, ma'am.

---

25

1  Q. And at -- had you asked him any questions at that point?
2  A. I asked if he had any weapons on him.
3  Q. Did you ask him anything else about his drug activity --
4  A. No, ma'am.
5  Q. -- or what he was doing, anything of that nature?
6  A. No, ma'am.
7  Q. And you said that he made a statement at that point; is that
8  correct?
9  A. Yes, ma'am.
10  Q. And what was that statement?
11  A. That she had nothing to do with this or his wife had nothing
12  to do with this.
13  Q. Had you placed him in handcuffs at that time?
14  A. After that statement was made, I believe he was placed in
15  handcuffs and advised that it was for officer safety based on
16  him trying to, at one point, get to the rear of the vehicle and,
17  at one point, what appeared to be is him about to run.
18      MS. REDMOND: Judge, I believe that's all the
19  government has for this witness.
20      THE COURT: Ms. Cooper?
21          CROSS-EXAMINATION
22  BY MS. COOPER:
23  Q. Mr. Whiten, you had indicated that there had been other
24  times surveillance had taken place by you or your agency on
25  Mr. Jefferson; is that correct?

---

26

1  A. Yes, ma'am.
2  Q. On how many occasions, to your knowledge?
3  A. Within the last couple of weeks leading up to this, at least
4  six or seven times. Within the last three months, at least 30
5  times.
6  Q. Could you please tell the Court what different circumstances
7  occurred on December 6th, 2002, that caused you to approach
8  Mr. Jefferson and the fact that you did not on the other
9  occasions?
10  A. On the other occasions, at that particular business there
11  was never no one in the business. It was never open. There was
12  never cars in front or persons inside the business. On that
13  particular occasion, what led to us making contact with
14  Mr. Jefferson is that -- his pulling up in the vehicle, getting
15  into the one car, seeing us, and not getting in that car and
16  trying to make it to a second car. Went to Mr. Jefferson.
17  Tried to approach Mr. Jefferson. He wouldn't let us approach
18  him by trying to get to the vehicle. If he had have fleed the
19  other direction or -- you know, it may have been different. But
20  he tried to make it to the vehicle, which based on officer
21  safety and, you know, the history of Mr. Jefferson's -- the
22  history I knew of Mr. Jefferson, we made contact with him.
23  Q. Is it your testimony of the 30 times that surveillance took
24  place you never saw Mr. Jefferson?
25  A. Not at that business.

---

8 (Pages 23 to 26)

United States of America v. Wendall Jefferson                                                    May 29, 2003

27

1  Q. And is it correct that -- is it correct that your testimony
2  is you're basing the stop and detainment of Mr. Jefferson on the
3  fact that he appeared that he wanted to flee?
4  A. No, ma'am, not just that reason.
5  Q. What would be your other reasons for the stop?
6  A. Based on the information that he was using the business to
7  sell cocaine. He was using the red-and-white older-model
8  Caprice that was parked there to transfer cocaine. Based on
9  information that we had from confidential informants, reliable
10  informants, and other law enforcement agencies.
11  Q. Who were those informants, Mr. Whitten?
12       MS. REDMOND: Objection. That goes beyond the purpose
13  and scope of this hearing.
14       THE COURT: I'm not sure it does. He says that the
15  reason he was surveilling the business in the first place was
16  because of information he received. And the reason he
17  approached Mr. Jefferson was because of information he had about
18  what was going on at the business. Officers can't just walk up
19  to anybody on the street and stop them and pat them down. They
20  have to have probable cause to do so, some reason to believe.
21  And if all Mr. Jefferson was doing was -- if all he did was to
22  avert his course from one vehicle to another, that alone would
23  not have been reason to stop him. So he has to tell where he
24  got the information from and make a showing of reliability.
25  That's what Terry was all about.

28

1  Q. (Ms. Cooper, continuing:) Do you want me to repeat the
2  question?
3  A. Yes, ma'am, please.
4  Q. If you would, please tell us the names of the confidential
5  informants that you deemed to be reliable --
6       THE COURT: Let's start, Ms. Cooper --
7       MS. COOPER: Yes, ma'am.
8       THE COURT: -- by having him tell why he relied on
9  them.
10       MS. COOPER: Yes, ma'am.
11       THE COURT: We'll get to the names.
12  Q. If you would, please tell us --
13       THE COURT: And how many were there?
14       THE WITNESS: I can name three of them.
15       THE COURT: Let's refer to them right now as A, B, and
16  C.
17       THE WITNESS: Yes, ma'am.
18       MS. REDMOND: Your Honor, if you wouldn't mind, all of
19  that has been turned over, actually, and I believe names have
20  been turned over to Ms. Cooper in discovery.
21       THE COURT: Well, fine. Then refer to them by name.
22       THE WITNESS: Yes, ma'am.
23  A. Back several months before this incident occurred, myself
24  and other agents had contact with an Investigator Franklin from
25  the Russell County Sheriff's Office. He turned over a

29

1  confidential and reliable informant. I'm not familiar with his
2  name. Sergeant Franklin has his name. However, we used this
3  individual along with Sergeant Franklin from the sheriff's
4  office to make a phone call to Mr. Jefferson and ordered a
5  quantity of crack cocaine. This deal never did pan out for
6  reasons unknown. That was approximately 60 days before this.
7  I'm not familiar with that subject's name. I couldn't get in
8  touch with Franklin yesterday about it.
9  Q. (Ms. Cooper, continuing:) All right. If I could, may I
10  just direct some questions to that confidential informant,
11  please?
12  A. Uh-huh.
13  Q. Mr. Whitten, you prepared a case summary --
14       THE COURT: One moment.
15       MS. COOPER: I'm sorry.
16       THE COURT: I'm not sure what the relevance of what you
17  just said is. You just said you used one from Sergeant
18  Franklin. Was he the person who told you about Mr. Jefferson?
19       THE WITNESS: Yes, ma'am. We made a call to --
20       THE COURT: The pertinent thing is not -- the pertinent
21  issue here, Agent Whitten, is not what that agent did that
22  didn't lead anywhere. The pertinent information here is what
23  information did that person provide you about Mr. Jefferson.
24       THE WITNESS: Yes, Your Honor.
25       THE COURT: Tell us that.

30

1       THE WITNESS: He stated that on many occasions he had
2  purchased ounces of crack cocaine from Mr. Jefferson. On this
3  particular occasion, before the phone call that -- he had
4  related to us that he had asked for $100 worth of crack cocaine
5  and that he had been to a location on Brickyard Road in Phenix
6  City and purchased cocaine from Mr. Jefferson several times.
7  Q. (Ms. Cooper, continuing:) Okay. Are we talking about
8  confidential informant A?
9  A. Yes, ma'am.
10       THE COURT: What's the name? Let's just use the name.
11  Who is it, Ms. Redmond, the one he got from Sergeant
12  Franklin? Who is that?
13       MS. REDMOND: Your Honor, I am looking for it.
14  That's -- I don't know who that is. I thought we were going to
15  be talking about Dewayne.
16       THE WITNESS: We are.
17       THE COURT: Is that who it is?
18       THE WITNESS: No, ma'am, not --
19  Q. (Ms. Cooper, continuing:) Is it Reginald Davis? I mean I
20  don't know.
21  A. That's -- Reginald Davis is going to be C.
22  Q. Okay. Reginald Davis is C.
23  A. Yes, ma'am.
24  Q. You don't know the name of A.
25  A. No, ma'am.

9 (Pages 27 to 30)

United States of America v. Wendall Jefferson                                                May 29, 2003

31

1   Q. Did you have contact with A yourself?
2   A. Yes, ma'am.
3   Q. You had contact with a reliable confidential informant and
4   you don't know his name?
5   A. He wasn't my informant. I was just -- I was just part of
6   the surveillance team.
7   Q. Officer Whitten, in your case summary that was provided to
8   me in the discovery, information is in there that states an
9   informant stated he could buy cocaine from Jefferson. Several
10  attempts were made to use this informant with no success.
11  A. Yes, ma'am.
12  Q. Is that confidential informant A?
13  A. Yes, ma'am.
14  Q. And you believe that he's reliable even though he could make
15  no buy from Mr. Jefferson?
16  A. Another law enforcement agent had used this subject and
17  stated that he was reliable.
18  Q. But you have no personal knowledge other than what an
19  officer told you.
20  A. No, ma'am.
21  Q. And no --
22      THE COURT: Who is that officer?
23      THE WITNESS: That's Sergeant Franklin.
24      THE COURT: And who is Sergeant Franklin?
25      THE WITNESS: He's a Muscogee -- I mean a Russell

32

1   County deputy.
2   Q. Who is confidential informant B that you relied upon?
3   A. Her name is Christy Redman.
4   Q. And I apologize. I need to go back. Is confidential
5   informant A a convicted felon?
6   A. Not that I'm aware of. I'm not -- I'm not sure.
7   Q. You don't know.
8   A. I wasn't the case agent that worked it.
9   Q. Do you know if he currently has criminal charges pending in
10  any court?
11  A. I believe at that time he did, but I'm not sure what.
12  Q. And I'm sorry. Confidential informant B, Christy Redman --
13  A. Yes, ma'am.
14  Q. -- did you have direct contact with Christy Redman?
15  A. Yes, ma'am, I did.
16  Q. What, if anything, did you learn from Christy Redman that
17  formed a basis for your stop on December 6th?
18  A. She had stated that she had purchased cocaine in the past
19  from a subject known as Buck. Buck was identified as Wendall
20  Jefferson.
21  Q. And is Christy Redman a convicted felon? Do you know?
22  A. Not that I know of. She was -- she did have a charge at the
23  time that she --
24      THE COURT: Counsel, let me stop you here. Let me stop
25  both of you. This is a motion to suppress. I'm not a jury. So

33

1   whether or not she was a convicted felon is entirely irrelevant
2   to what I have to decide. I'm interested in how he came to rely
3   upon her and in whether or not she had done or said anything in
4   the past that established reliance or disestablished reliance.
5      MS. COOPER: Yes, ma'am.
6      THE COURT: But in the context of what we're talking
7   about, her criminal record is not of -- it's not of a lot of
8   consequence.
9      MS. COOPER: I apologize.
10     THE COURT: Unless her criminal record put her in touch
11  with the defendant. And if it did, please say it.
12     THE WITNESS: Yes, ma'am.
13     THE COURT: Let's not try -- let's not conduct this
14  proceeding as though there are 12 people sitting over there.
15     MS. COOPER: Yes, ma'am.
16     THE COURT: Because I have a specific task I have to
17  do. I have specific findings I have to make. And I wish that
18  you would, in the vernacular, cut to the quick.
19     MS. COOPER: Yes, ma'am.
20  Q. (Ms. Cooper, continuing:) Have you used Christy Redman in
21  the past as a confidential informant?
22  A. Yes, ma'am, I have.
23  Q. And of those times that you've used Christy Redman, how many
24  of those times ended with a conviction of a defendant?
25  A. This particular informant was used by myself twice. On both

34

1   times a quantity of narcotics was seized. The information that
2   she gave was -- had proven reliable. Two arrests were made and
3   two arrests are pending trial now.
4   Q. Never a conviction at this point.
5   A. No, ma'am. They're on the trial docket for the month of
6   June.
7   Q. Now, confidential informant three you said was a Reginald
8   Davis?
9   A. Yes, ma'am. Dewayne Reginald Davis.
10  Q. Did you have contact directly with Mr. Davis?
11  A. Yes, ma'am, I did.
12  Q. Did you use him in investigation or --
13  A. Yes.
14  Q. -- sting operations?
15  A. Yes, ma'am. He was used in one investigation that I did.
16  Q. And did that result in a conviction of that defendant?
17  A. That's still an ongoing investigation. Information was
18  proven reliable that he gave.
19  Q. Mr. Whitten, you have shown us on the video display of this
20  business where you were parked.
21  A. Yes, ma'am.
22  Q. And I'm going to ask you, sir, did your vehicle remain in
23  that parking place during the entire time that you approached
24  Mr. Jefferson and the other people?
25  A. Yes, ma'am, it did.

Risa L. Entrekin, RDR, CRR  U.S. District Court
One Church Street, Montgomery, AL  36104 334-240-2405

United States of America v. Wendall Jefferson                                          May 29, 2003

35

1  Q. You never pulled your vehicle behind the vehicle
2  Ms. Jefferson was standing at and prevented her from leaving?
3  A. No, ma'am.
4  Q. At any point in time, did Mr. Jefferson flee?
5  A. No, ma'am.
6  Q. You stated you did not -- none of the other officers had any
7  weapons drawn; is that correct?
8  A. Yes, ma'am.
9  Q. And was Mr. Jefferson or any of the other individuals placed
10  in handcuffs prior to a frisk of their person?
11  A. No, ma'am.
12  Q. They were placed in handcuffs after they were patted down?
13  A. Yes, ma'am.
14  Q. Did you find any weapons on their person?
15  A. Not on their persons.
16  Q. Did you find any weapons in any vehicle?
17  A. Not any weapons.
18  Q. Then why did you place them in handcuffs at that point?
19  A. At the point when Mr. Jefferson was placed into handcuffs
20  was when he was making the statements over to Sergeant Price's
21  area that she had nothing to do with this. Based on that
22  statement and his demeanor and attempting to get to the rear of
23  the vehicle, he was placed under handcuffs. While he was being
24  placed under handcuffs is when Sergeant Price yelled over at us
25  to place him in handcuffs.

36

1  Q. And the --
2      THE COURT: What was he under arrest for then?
3      THE WITNESS: At that point is when Sergeant Price
4  found evidence in the vehicle that Mr. Jefferson had got out of.
5      THE COURT: Price was, in the meantime, searching the
6  vehicle that Hawk was sitting in after Hawk consented.
7      THE WITNESS: Yes, ma'am.
8      THE COURT: And at that -- when he found something in
9  there --
10     THE WITNESS: He yelled.
11     THE COURT: -- he yelled to you to place Jefferson in
12  handcuffs.
13     THE WITNESS: Yes, ma'am.
14     THE COURT: Go on.
15  Q. Were there other people present in the area?
16  A. There was a subject by the name of -- I believe her name was
17  Andrea, the other person that was in the business. There
18  were -- there's a pizza place at the other end of the restaurant
19  (sic). There was, I believe, one or two employees that were in
20  that business at the time and no one else.
21  Q. Did you see anyone near the Blimpee station -- Blimpee
22  store?
23  A. Not --
24     THE COURT: One moment. What does this have to do with
25  this search and probable cause for the search?

37

1      MS. COOPER: Judge, I was just attempting to lay out a
2  foundation for an additional --
3      THE COURT: But you don't have to do that. This is a
4  suppression hearing. If you have a question, ask it.
5      MS. COOPER: Yes, ma'am.
6      THE COURT: Is there any involvement of this second
7  female in this?
8      THE WITNESS: Other than being in the business with the
9  wife, no, ma'am.
10     THE COURT: Do you know of any involvement with her?
11     MS. COOPER: No, ma'am.
12     THE COURT: So let's not refer to her anymore. Don't
13  talk about her.
14     MS. COOPER: Nothing further.
15     THE COURT: Ms. Redmond, any redirect?
16     MS. REDMOND: No, ma'am.
17     THE COURT: Step down.
18  Next witness?
19     MS. REDMOND: Agent Price.
20     THE CLERK: Agent Price, please come to the courtroom.
21     THE COURT: Unless you have some reason to believe that
22  Agent Price has a different version of what happened up to the
23  time of the stop, please don't review it.
24     MS. REDMOND: Yes, ma'am.
25     THE COURT: And Ms. Cooper, I will not hold you to

38

1  cross-examination on -- solely on the direct. If you have some
2  reason to believe that Agent Price had something else to say
3  about the surveillance before the stop, you may do so. I just
4  want to avoid duplicative testimony about the same thing.
5      JAMES PRICE, the witness, having been previously
6  sworn, testified, as follows:
7          DIRECT EXAMINATION
8  BY MS. REDMOND:
9  Q. Would you state your name for the record?
10  A. James Price.
11  Q. And are you employed?
12  A. Yes, ma'am.
13  Q. How are you employed?
14  A. I'm a sergeant with the Harris County Sheriff's Department.
15  Q. Were you involved in an investigation of Wendall Jefferson?
16  A. Yes, ma'am.
17  Q. Okay. And did that take place on December 6th, 2002?
18  A. Yes, ma'am.
19  Q. And did that take place at a location known as Head to Toe
20  Studios in Phenix City, Alabama?
21  A. Yes, ma'am, it did.
22  Q. Agent Price, who out there did you make contact with?
23  A. We made contact --
24  Q. No. I'm asking specifically who you made contact with.
25  A. The first person I made contact with was a female later

11 (Pages 35 to 38)

United States of America v. Wendall Jefferson                                    May 29, 2003

---

39

1  identified as Jennifer Hawk.
2  Q. And do you know what, if any, relationship Ms. Hawk has to
3  Mr. Jefferson?
4  A. She stated that she was his wife.
5  Q. How did you come into contact with Ms. Hawk?
6  A. We had been conducting surveillance on the business. Then
7  once they exited the business, I approached her.
8  Q. And what happened or what occurred as you approached her?
9  A. She was sitting in the vehicle that we saw the subject that
10 we had been watching pull up in. She was --
11 Q. Is that Mr. Jefferson?
12 A. Yes, ma'am, it is.
13 Q. Okay. And she was sitting on -- where in the vehicle?
14 A. She was in the driver's side.
15 Q. Okay. What happened as you approached?
16 A. As I approached, other agents exited my vehicle. Two went
17 to Mr. Jefferson's location, and Agent Johnson went to another
18 female's location. As I was approaching Ms. Hawk, she
19 approached me and asked me what was going on.
20 Q. She got out of the vehicle?
21 A. Yes, ma'am.
22 Q. She walked up to you?
23 A. Yes, ma'am.
24 Q. Asked you what was going on?
25 A. Yes, ma'am.

---

40

1  Q. What did you tell her, if anything?
2  A. I identified myself and told her I was Sergeant Price with
3  the Metro Narcotics Task Force, that we had received information
4  that Mr. Jefferson was running a drug business from Head to Toe.
5  Q. What, if anything, was her response?
6  A. She said she didn't know anything about any drug business.
7  I said, do you mind if I check your vehicle? I said,
8  Mr. Jefferson pulled up in it. I said, do you mind if I check
9  your vehicle? She said -- I said, do you have any narcotics,
10 any weapons, anything in your vehicle? She said, no. I said,
11 well, do you mind if I check? She said, no, go ahead.
12 Q. And you did that.
13 A. Yes, ma'am.
14 Q. What, if anything, did you find?
15 A. Once I opened the door, the first thing that I noticed was a
16 strong smell of ether. And that's used in the manufacture
17 of cocaine. And then I noticed a blue Wal-Mart shopping bag
18 sitting on the passenger side.
19 Q. What, if anything, did you do at that point?
20 A. I then reached over and picked up the bag, looked in it, and
21 saw a Ziploc bag that contained a large quantity of powder
22 cocaine.
23 Q. What, if anything, did you do at that point?
24 A. At that point, then, I stepped back out -- I had reached
25 over through the driver's side. I stepped back out, and I told

---

41

1  Agent Whitten and Nemmo to put cuffs on Mr. Jefferson for
2  officer safety. And then I also put my cuffs on Ms. Hawk and
3  told her that it was for officer safety. And then I advised
4  Agent Johnson to put cuffs on the other female.
5  Q. Did all of the agents put cuffs on their individual people?
6  A. Yes, ma'am.
7  Q. Did Ms. Hawk make any other statements at that point?
8  A. She stated she didn't know anything about what was in the
9  vehicle.
10 Q. Did you hear any other statements being made from any of the
11 other -- from the other two individuals out there in handcuffs?
12 A. I heard nothing from the female that was with Agent
13 Johnson. Mr. Jefferson kept yelling, my wife has nothing to do
14 with this. My wife has nothing to do with this.
15 Q. What, if anything, did you do after -- with Ms. Hawk after
16 she was placed in handcuffs?
17 A. Okay. At that time, I -- like I said, I retrieved the
18 cocaine. I showed it to Agents Nemmo and Whitten. A patrol
19 unit had pulled in while we were doing -- while we had started
20 this, and we --
21 Q. Had you-all called the patrol unit?
22 A. No, ma'am.
23 Q. Okay. Go ahead.
24 A. And what we did is we put Mr. Jefferson in the backseat of
25 the patrol car. And then Agent Whitten came up to me, and I

---

42

1  showed him the suspected cocaine. And he advised Ms. Hawk of
2  her rights, and then we asked for a consent of the Head to Toe
3  Studio.
4  Q. And did she give consent?
5  A. Yes. We used a written form on that, and she signed it.
6  Q. Okay. And did it clearly indicate that it was Head to Toe
7  that you wanted to search?
8  A. Yes.
9  Q. Was there any other consent that you requested and that
10 Ms. Hawk gave to search anything else?
11 A. Yes. After we searched Head to Toe, we found out that she
12 had a house on Wright Road, which is also in Phenix City,
13 Alabama. We asked her if she would be willing to sign a consent
14 for that residence. She stated she would. And we went to 121
15 Wright Road, and she signed a consent for that residence.
16 Q. Are you still -- while the written consent is being
17 executed, are you-all still out at Martin Luther King Parkway?
18 A. We did the consent for Head to Toe at Martin Luther King
19 Parkway. Then we went to the residence and had -- read her the
20 same form and had her sign that.
21 Q. You took her to the residence?
22 A. Yes.
23 Q. Okay. What, if anything, did you find in Head to Toe?
24 A. There was --
25        THE COURT: Before you testify about that, what is

---

12 (Pages 39 to 42)

United States of America v. Wendall Jefferson                                    May 29, 2003

---

43

1   Hawk's interest in Head to Toe?
2           THE WITNESS: She stated she was the owner of the
3   business.
4           THE COURT: She told you that?
5           THE WITNESS: Yes.
6           THE COURT: Thank you. Proceed.
7   Q. What, if anything, did you find in Head to Toe?
8   A. We found a submachine gun pistol, I think a couple -- couple
9   or three bags of -- plastic bags with cocaine residue. We took
10  several photos just of the -- the shop.
11  Q. Let me go back for just a moment. Did you have -- or did
12  Ms. Hawk indicate who was the owner of the vehicle, the Impala,
13  I believe it was, that she was in the driver's seat?
14  A. She told me it was her vehicle. She had just bought it.
15          THE COURT: That she had just bought it?
16          THE WITNESS: Yes, ma'am.
17  Q. Let's go back for just another moment. You said that when
18  you opened the car door, you smelled ether?
19  A. Yes, ma'am.
20  Q. Are you familiar with ether?
21  A. Yes, ma'am.
22  Q. How are you familiar with ether? How did you become
23  familiar with it?
24  A. I've worked -- I had worked narcotics for 12 years, and I
25  was very familiar with the smell of powder cocaine and also the

---

44

1   smell of crack cocaine.
2   Q. When you looked in the bag, how did you come to the
3   conclusion or belief that what you were looking at was cocaine?
4   A. From my knowledge as a narcotics investigator.
5   Q. Did you do any field tests on that substance?
6   A. I don't recall if any --
7   Q. Did you.
8   A. No, I did not. No, ma'am.
9   Q. You said that -- let me ask it this way. How was Ms. Hawk
10  transported to the residence?
11  A. Actually, I don't -- I don't recall.
12  Q. What, if anything, was found at the residence?
13  A. At the residence, we also found another machine gun pistol,
14  a submachine gun pistol, a double-barrel shotgun, some scales,
15  and a quantity of crack cocaine.
16  Q. Was all of that evidence impounded?
17  A. Yes, ma'am, it was.
18  Q. Was the drug evidence sent to a forensics laboratory for
19  analyzation?
20  A. Yes, ma'am.
21  Q. Were the guns impounded?
22  A. Yes, ma'am.
23          THE COURT: You actually found crack cocaine at the
24  residence?
25          THE WITNESS: Yes, ma'am, we did.

---

45

1           THE COURT: How much?
2           THE WITNESS: I'm not sure of the total. I thought it
3   was over two ounces of crack cocaine.
4   Q. Where did you find it in the residence?
5   A. There was a back bedroom. I think Agent Spear actually
6   found the crack cocaine. There was a computer desk, and it was
7   in a white plastic bag up -- up in a drawer up under the
8   computer desk.
9   Q. If you recall, was Ms. Hawk present in the residence when
10  the drugs were found or the guns were found?
11  A. Yes. She was at the residence when the drugs --
12  Q. Was she in the residence?
13  A. Yes.
14  Q. Okay. Did Ms. Hawk make any other statements to law
15  enforcement about her knowledge of either the guns or the drug
16  evidence located?
17  A. I basically remember her saying that her and Mr. Jefferson
18  were having problem -- marital problems because of his drug
19  dealing and that they were separated for some time and they were
20  trying to work things out.
21  Q. Do you remember her saying anything or indicating her
22  knowledge of the guns?
23  A. I believe she stated that she had bought the guns from an ad
24  in the newspaper or something to that effect.
25  Q. Do you recall if she said for what purpose she bought the

---

46

1   guns?
2   A. I think Agent Whitten asked her about the guns, and she
3   stated that Wendall couldn't -- Mr. Jefferson couldn't buy them
4   because he was a convicted felon.
5   Q. You had indicated that it was your -- that you remembered
6   that Ms. Hawk had said that they had been -- she and
7   Mr. Jefferson had been separated; is that correct?
8   A. Yes, ma'am.
9   Q. Do you recall if Ms. Hawk in any way indicated that
10  Mr. Jefferson resided at that house or who resided at the
11  residence?
12  A. She stated they were trying to get back together and they
13  were both back at the residence. I remember when we went to the
14  residence, there was -- there were -- there was a Christmas tree
15  and a bunch of Christmas presents and baby items. And I believe
16  when -- I remember when we went in, there was a video game, a
17  Playstation II video game, that was still going when we got
18  there.
19  Q. Was anybody at the residence when you arrived?
20  A. No, ma'am.
21  Q. And you had indicated that there were some baby items. Do
22  you know whether or not Mr. Jefferson and Ms. Hawk have a child?
23  A. That's one reason she stated that they were trying to make
24  things work out, because they did have a child together.
25  Q. Was it a baby? Do you know?

---

13 (Pages 43 to 46)

United States of America v. Wendall Jefferson                                        May 29, 2003

47

1   A. I want to say it was probably about two or three years old.
2   Maybe not that old. A young baby, because I found -- I
3   photographed baby items I saw at the house, diapers, bottles.
4        THE COURT: Relevance, Counsel?
5        MS. REDMOND: It's beyond the scope of my question.
6        THE COURT: Move on.
7        MS. REDMOND: Thank you. Nothing further for this
8   witness.
9        THE COURT: Ms. Cooper?
10       MS. COOPER: Yes, ma'am.
11           CROSS-EXAMINATION
12   BY MS. COOPER:
13   Q. Agent Price, you had indicated in your testimony that you
14   had been part of a previous surveillance of Mr. Jefferson; is
15   that correct?
16   A. Yes, ma'am.
17   Q. On how many occasions did you surveil Mr. Jefferson?
18   A. The business or the residence?
19   Q. Him personally.
20   A. We had been by -- I hadn't actually seen Mr. Jefferson
21   personally. We tried to make a drug buy one time, and he wasn't
22   at the residence. And then we had been by the business several,
23   several times.
24   Q. So this incident at Head to Toe was the first time you or
25   your officers had actually made physical contact with him?

48

1   A. Yes, ma'am.
2   Q. Do you have any personal knowledge of any confidential
3   informants who had given information to you about Mr. Jefferson?
4   A. Sergeant Franklin with the Russell County Sheriff's
5   Department --
6   Q. I'm asking you. Do you have any personal contact or
7   information that a confidential informant gave personally to
8   you?
9   A. Yes, ma'am. What I was saying was Sergeant Franklin turned
10   an informant over to us to try to make a buy from Mr. Jefferson.
11   Q. Was that successful?
12   A. No.
13   Q. And did you talk with that informant?
14   A. Yes, ma'am, I did.
15   Q. Do you see the picture on the screen that has been admitted
16   into evidence?
17   A. Yes, ma'am, I do.
18   Q. According to the testimony of Mr. Whitten, the vehicle --
19       THE CLERK: Use your finger --
20       MS. COOPER: I'm sorry.
21       THE CLERK: -- on the screen. Just put your finger on
22   the screen.
23       MS. COOPER: I apologize.
24   Q. According to Mr. Whitten's testimony -- I've got an arrow
25   there. It may not be exactly correct. But in that vicinity is

49

1   where he has indicated that the vehicle you and the agents were
2   in was parked. Is that approximately correct?
3   A. That looks about correct. Yes, ma'am.
4   Q. Where was the vehicle, your vehicle, when you encountered
5   Mr. Jefferson?
6   A. After we pulled out when he saw us?
7   Q. Yes.
8   A. I -- I pulled -- can you see what I'm doing? Ms. Hawk's
9   vehicle was pulled right towards the front door. I pulled
10   almost directly behind it, but not behind it. I mean the bumper
11   was -- my bumper was not to her bumper.
12   Q. It's true that she was not free to move her vehicle or could
13   not at that time. Would that be a true statement?
14   A. She could have backed out. Yes, ma'am.
15   Q. Okay. But your vehicle did not remain in that parking
16   place. You moved it at the time you initiated contact with
17   these subjects; is that correct?
18   A. That's correct.
19   Q. Now, it's my understanding that your testimony is that
20   Ms. Jefferson -- Ms. Hawk gave you verbal permission to search
21   the vehicle that she was standing next to; is that correct?
22   A. She was actually sitting in the vehicle when I approached.
23   Q. And you asked her to exit the vehicle, and she did.
24   A. No. She approached me and said, what's going on. She
25   seemed to be upset.

50

1   Q. And at some point in time she gave you verbal consent --
2   A. Yes, ma'am.
3   Q. -- to search that vehicle, correct?
4   A. That's correct.
5   Q. Where did you find contraband?
6   A. The bag with the cocaine?
7   Q. Yes.
8   A. In the passenger-side seat, front passenger-side seat.
9   Excuse me.
10   Q. What kind of bag was it in?
11   A. It was a blue Wal-Mart bag.
12   Q. Were there any contraband in plain sight? Could you see
13   anything out of the Wal-Mart bag, or did you have to open the
14   Wal-Mart bag?
15   A. I want to say that the Wal-Mart bag was kind of loosely
16   tied -- I mean, you know how you put the plastic together and
17   just loosely tie it. I want to say that that's the way it was.
18   Q. You had to open the bag to find the contraband. Would that
19   be correct?
20   A. That would be correct.
21   Q. Okay. Did you find any ether in the vehicle?
22   A. No, ma'am. I didn't find any ether.
23   Q. Did you find any weapons in any of the vehicles?
24   A. Didn't find any weapons in the vehicle. Found some bullets
25   in the Caprice that Mr. Jefferson was heading at -- heading to.

14 (Pages 47 to 50)

United States of America v. Wendall Jefferson                                    May 29, 2003

**51**

1  Excuse me.
2  Q. My final question to you, Agent Price, is just for
3  clarification, was Mr. Jefferson or any of the subjects placed
4  into handcuffs prior to you finding the contraband?
5  A. I was told that Mr. Jefferson -- not in my presence.
6  Ms. Hawk was placed in handcuffs after I found the contraband,
7  and I hollered across the parking lot for them to place
8  Mr. Jefferson in handcuffs for officer safety.
9  Q. So your testimony is they were not placed in handcuffs until
10 after the contraband was found.
11 A. My -- the woman I was talking to, Ms. Hawk, was not. And
12 the woman Agent Johnson was talking to was not. And I didn't
13 see them place handcuffs on Mr. Jefferson. I was told later
14 that they had placed handcuffs on him prior to me saying place
15 him in handcuffs for officer safety.
16 Q. So one of your coworkers has told you that he was placed in
17 handcuffs previous to the contraband being found.
18 A. That's correct.
19       MS. COOPER: Thank you.
20       MS. REDMOND: No further questions from the government.
21       THE COURT: This witness may step down. Thank you.
22       THE WITNESS: Thank you, Your Honor.
23       MS. REDMOND: Nothing further from the government.
24       THE COURT: Witnesses, Ms. Cooper?
25       MS. COOPER: Yes, ma'am. Andrea Johnson.

**52**

1       THE CLERK: Andrea Johnson, please come to the
2  courtroom.
3       THE COURT: Proceed.
4       ANDREA JOHNSON, the witness, having been previously
5  sworn, testified, as follows:
6          DIRECT EXAMINATION
7  BY MS. COOPER:
8  Q. Please state your name.
9  A. Andrea Johnson.
10 Q. And if you would, please speak loudly. These proceedings
11 are being recorded.
12 Ms. Johnson, where do you reside?
13 A. In Hampton, Georgia.
14 Q. How old are you?
15 A. 26.
16 Q. Are you employed?
17 A. Yes, ma'am.
18 Q. Where do you work?
19 A. St. Joseph's Mercy Care Services.
20 Q. Where is that located?
21 A. In Atlanta, Georgia.
22 Q. On December 6th, 2002, did you have occasion to be at a
23 business named Head to Toe in Phenix City, Alabama?
24 A. Yes, ma'am.
25 Q. What was your purpose in being at that business?

**53**

1  A. I came to visit my cousin and her husband. We were going to
2  go to a comedy act later on that night.
3  Q. And who is your cousin?
4  A. Jennifer Hawk.
5  Q. At what time did you leave that business, approximately, if
6  you remember?
7  A. After everything was over with?
8  Q. No. When did you exit the door? I'm sorry. When did you
9  exit to leave that night?
10 A. Oh. About 8:20.
11 Q. And at that time, did anyone approach you or did you see
12 anything?
13 A. I went to my car. And as I got in, a car pulled behind -- a
14 truck pulled behind me and blocked me in and got out.
15 Q. And did someone approach you?
16 A. Yes. Someone approached my car, asked me to step out the
17 car, and told me to step to the back of my car.
18 Q. Did you comply?
19 A. Yes, ma'am.
20 Q. What happened next?
21 A. He asked me for ID, put me in handcuffs, and told me that he
22 needed to put me in handcuffs for my safety -- for his safety.
23 Q. And do you see the picture that is on the screen that has
24 been previously admitted --
25 A. Yes, ma'am.

**54**

1  Q. -- as United States Exhibit #1 and also labeled as
2  Defendant's Exhibit #1?
3  A. Uh-huh.
4  Q. And does that picture accurately represent the business
5  known as Head to Toe?
6  A. Yes, ma'am.
7  Q. We have previously had an arrow here. Can you see that on
8  the screen?
9  A. Uh-huh.
10 Q. There has been testimony that that was where the officers'
11 vehicle was initially parked. Do you agree with that?
12 A. I don't know where the car was parked.
13 Q. In the vicinity.
14 A. But that's what --
15 Q. Okay. You didn't notice it? I'm sorry.
16 A. Yeah. I didn't notice it.
17 Q. Okay. Now, I'm going to make another arrow here, if I can.
18 Would that indicate to you where the vehicle that Ms. Hawk
19 approached be located?
20 A. Yes.
21 Q. Would that be correct?
22 A. Yes, ma'am.
23 Q. And would it be correct that your vehicle would be where I
24 have made the next mark there? Would that be correct or not?
25 A. No, ma'am.

15 (Pages 51 to 54)

United States of America v. Wendall Jefferson                                                    May 29, 2003

55

1  Q. Okay. I'm sorry. Could you tell us where your vehicle was?
2  A. It was parked on the right side of Jennifer's car.
3  Q. Okay. So on the opposite side.
4  A. Yes, ma'am.
5  Q. If I now bring a mark there, would that be correct?
6  A. Correct.
7  Q. And during this encounter with law enforcement, would you
8  have been standing the majority of the time behind the vehicle
9  or at the side of the vehicle?
10 A. Behind the vehicle.
11 Q. Now, how far were you from Ms. Jefferson -- Ms. Hawk --
12 excuse me -- during this encounter with the officer?
13 A. Maybe five feet. We were -- the cars were parked right next
14 to each other, and we were both standing at the rear of the car.
15 Q. And were you both in handcuffs?
16 A. Yes, ma'am.
17 Q. And at any time did you see any officers draw any guns?
18 A. No.
19 Q. Did they have guns present? Do you know?
20 A. I don't recall. I think they had them on their sides.
21 Q. At any point in time was your vehicle searched?
22 A. Yes, ma'am.
23 Q. And did you give permission for your vehicle to be searched?
24 A. Yes, ma'am.
25       THE COURT: What's the relevance of this?

56

1        MS. COOPER: I'm sorry.
2        THE COURT: None whatsoever.
3        MS. COOPER: I'm sorry.
4  Q. Did you hear any conversations that Ms. Hawk had with any of
5  the officers?
6  A. Some conversations off and on, because the --
7  Q. What did you hear, if anything?
8  A. I just recall them asking her what does she know about
9  this.
10 Q. Were you able to observe the officers remove anything from
11 the vehicle where Ms. Hawk was standing?
12 A. Yes.
13 Q. What did you observe?
14 A. A plastic bag.
15 Q. Were you in close enough proximity to know where the bag was
16 found?
17 A. In the front of the car.
18 Q. At any point in time -- I'm sorry. Let me rephrase that.
19 Where Mr. Jefferson was, were you able to observe him?
20 A. Yes.
21 Q. At any point in time did you see Mr. Jefferson flee or
22 attempt to flee?
23 A. No, ma'am.
24 Q. Was a pat-down search conducted of Mr. Jefferson?
25 A. I don't recall.

57

1  Q. Was one conducted of Ms. Hawk? Do you know?
2  A. I don't recall.
3  Q. And do you have any knowledge as to whether Ms. Hawk was in
4  handcuffs at the time that the search took place or not?
5  A. She was. Yes.
6        MS. COOPER: That's all, Your Honor.
7        THE COURT: Ms. Redmond?
8        MS. REDMOND: Limited, Your Honor.
9              CROSS-EXAMINATION
10 BY MS. REDMOND:
11 Q. Ms. Johnson, did you hear Mr. Jefferson making any
12 statements? Was he saying anything?
13 A. Yes.
14 Q. What was he saying?
15 A. Let my wife go. She has nothing to do with this.
16 Q. And did you -- were you close enough to hear if Ms. Hawk was
17 saying anything?
18 A. Yes. She -- she wasn't responding to him. No. She didn't
19 say anything.
20 Q. She wasn't answering Mr. Jefferson.
21 A. Unh-unh.
22 Q. Were the officers having lengthy conversation with her?
23 A. No. They were just searching the car.
24 Q. Okay. Had you been to the house out on -- I think it's
25 Wright Road?

58

1  A. Yes. I've been out there.
2  Q. Whose house is that?
3  A. Jennifer's and Wendall's.
4  Q. And that car that Ms. Hawk was in, was that her car?
5  A. Yes, ma'am.
6  Q. Okay. And that business, Head to Toe, whose business is
7  that?
8  A. Jennifer's.
9        MS. REDMOND: Nothing further.
10       THE COURT: Any redirect?
11       MS. COOPER: No, Your Honor.
12       THE COURT: You may step down, Ms. Johnson.
13       Next witness?
14       MS. COOPER: Towanna Lewis.
15       THE CLERK: Towanna Lewis, please come to the
16 courtroom.
17       THE COURT: How do you spell that?
18       MS. COOPER: Your Honor, I believe it's T-A-W-A-N-N-A.
19 I'll have to ask Ms. Lewis for certain.
20       THE COURT: Is Ms. Johnson excused?
21       MS. REDMOND: The government has no further.
22       THE COURT: Ms. Cooper?
23       MS. COOPER: Yes, ma'am.
24       THE COURT: Ms. Keith, you may advise her that she's
25 excused. She may come back into the courtroom or leave.

16 (Pages 55 to 58)

United States of America v. Wendall Jefferson                                May 29, 2003

---

59

1    THE CLERK: Towanna Lewis, please come to the
2    courtroom.
3    THE COURT: Is Ms. Lewis here?
4    MS. COOPER: Yes, ma'am.
5    THE COURT: Please advise Ms. Johnson that she's
6    excused. She may come back into the courtroom or leave,
7    Ms. Keith.
8    THE CLERK: Ms. Johnson, you are excused, or you may
9    come back into the courtroom.
10   MS. COOPER: Take the witness stand, please, right up
11   there.
12   THE COURT: Was this witness present on 12/6/02?
13   MS. COOPER: Yes, ma'am. Yes, ma'am.
14   THE COURT: Proceed.
15   TOWANNA LEWIS, the witness, having been previously
16   sworn, testified, as follows:
17        DIRECT EXAMINATION
18   BY MS. COOPER:
19   Q. State your name, please.
20   A. Towanna Lewis.
21   Q. Would you please spell Towanna?
22   A. T-O-W-A-N-N-A, Lewis, L-E-W-I-S.
23   Q. Ms. Lewis, where do you live?
24   A. Phenix City, Alabama.
25   Q. And are you employed?

---

60

1    A. Yes, ma'am, I am.
2    Q. Where do you work?
3    A. Citi Trends.
4    Q. And how old are you, Ms. Lewis?
5    A. 25.
6    Q. Back on December 6th of 2002, did you have an occasion to be
7    near a business known as Head to Toe in Phenix City?
8    A. Yes, ma'am.
9    Q. And what was your occasion for being near that business?
10   A. I was working at Blimpee's during that time.
11   Q. And there is a picture on the screen. Do you see that
12   picture?
13   A. Yes, ma'am.
14   Q. Is the business shown there, Blimpee, the one that is
15   located next to Head to Toe, the business you were employed at
16   at the time?
17   A. Yes, ma'am.
18   Q. On December 6th, 2002, were you at work at around 8:20 in
19   the evening?
20   A. Yes, ma'am.
21   Q. Did you observe anything unusual that evening?
22   A. Yes. During that time, I was, like, working that evening.
23   And I was, like, sitting in the Blimpee's lobby. And during
24   that time, a white truck, like, pulled up in front of Blimpee's.
25   So I thought maybe it was, like, a customer. So during that

---

61

1    time, I was, like, talking to my cousin. I said, a customer
2    coming. So the truck was just sitting out there in front of the
3    place. So I said, well, I'm not going to leave out the lobby
4    until the customer come in. So --
5    Q. Okay. So you observed the vehicle. If you'd let me
6    redirect, I'd appreciate it. You observed the vehicle, correct?
7    A. Yes, ma'am.
8    Q. At some point in time did any commotion or anything occur
9    that caught your attention?
10   A. Could you repeat that again?
11   Q. Did anything occur that caught your attention or draw your
12   attention to the business known as Head to Toe?
13   A. Yes. When Wendall pulled up and when I seen, like, the
14   white truck back back, and it just, like, blocked Wendell's
15   wife's car in. So when I seen that, it was like four policeman
16   got out the car. So that's when I entered the Blimpee's door
17   and I walked closer.
18   Q. Now, you walked outside the business?
19   A. Yes, ma'am.
20   Q. Okay. And looking at the picture on the screen, Ms. Lewis,
21   is there any marker or something that you could tell us you were
22   located near during the time you were outside the business
23   observing this?
24   A. Do you want me to point?
25   Q. Or can you just tell us?

---

62

1    A. Okay. I'd say right there almost by the second -- by the
2    second arrow.
3    THE COURT: Tell the Court where you were on the
4    picture.
5    THE WITNESS: Okay.
6    THE COURT: Just tell the Court where you were on the
7    picture.
8    THE WITNESS: Okay. I was, like, basically standing by
9    the second handicapped -- the handicapped sign.
10   THE COURT: The handicapped sign that is in front of
11   Head to Toe?
12   THE WITNESS: Yes, ma'am.
13   THE COURT: All right.
14   Q. And what, if anything, did you observe at that time?
15   A. Okay. During that time, Jennifer -- Jennifer -- when I
16   entered out of Blimpee's, Jennifer was coming out of Head to
17   Toe. So during that time when the truck -- put the truck in
18   reverse and blocked her in. And they asked her to get out the
19   car. And when they asked her to get out the car, they --
20   Q. Did you hear all this, Ms. Lewis? I don't mean to interrupt
21   you. But did you hear all this?
22   A. Yes, ma'am.
23   Q. Okay. Go ahead.
24   A. Okay. When they asked her to enter out the car, they took
25   her to the back. When they took her to the back, they throwed

---

17 (Pages 59 to 62)

United States of America v. Wendall Jefferson                                May 29, 2003

63

1    the handcuffs on her then. When they put handcuffs on her,
2    that's when I was asking her, I said, do you need me to call
3    your mother or anything. So during that time, she wasn't
4    responding to me. So there was another guy -- you know, I
5    think -- I don't know who he was, but there was another guy
6    entered into her car on the driver's side. And they looked up
7    under the seat and they got, like, a blue bag out from up under
8    the seat.
9    Q. And you saw this?
10   A. Yes, ma'am.
11   Q. And once again, let me redirect you. Was Jennifer in
12   handcuffs at the time the search was made?
13   A. Yes, ma'am.
14   Q. Did you hear any conversation to the effect that Jennifer
15   gave permission to search the car, or could you hear anything?
16   A. No, ma'am, I didn't.
17   Q. You did not hear anything?
18   A. No, ma'am.
19   Q. Were you able to observe Mr. Jefferson at any time?
20   A. Okay. When they had done put her in handcuffs, he was
21   walking toward his car. It was parked up on the street. And
22   when he was walking to his car, he got a chance to open the
23   door, but he didn't get a chance to -- you know, to sit inside
24   of the car. Then that's when another guy walked over to him and
25   handcuffed him.

64

1    Q. Did you ever see any indication that Mr. Jefferson ran or
2    attempted to flee or run?
3    A. No, ma'am, I didn't.
4        MS. COOPER: Thank you.
5                CROSS-EXAMINATION
6    BY MS. REDMOND:
7    Q. Ms. Lewis, was it your testimony that you and a cousin were
8    working at Blimpee's that evening?
9    A. Yes, ma'am.
10   Q. And at 8:20 you saw the white vehicle pull up and park?
11   A. Yes, ma'am.
12   Q. Okay. And how long after that was it that you
13   saw Mr. Jefferson?
14   A. Okay.
15   Q. When -- how long? How soon? How long?
16   A. Okay. The -- the truck was, like, parked --
17   Q. I'm talking about in terms of time.
18   A. Okay. After they pulled up, it was, like, 15 -- about 15 to
19   20 minutes after Jefferson pulled up.
20   Q. So sometime around 8:35 Mr. Jefferson pulled up.
21   A. Yes, ma'am.
22   Q. What was he driving?
23   A. He was driving the Malibu, I think, the Impala, burgundy.
24   Q. And is that the one that's parked right -- that ends up
25   being parked right in front of the business, Head to Toe?

65

1    A. Yes, ma'am.
2    Q. Okay. Do you know Jennifer?
3    A. Yes.
4    Q. How do you know her?
5    A. By just -- by me working at Blimpee's. She used to come in
6    as a customer.
7    Q. Do you know Mr. Jefferson that way as well?
8    A. No. I just know him around, you know, just going out and
9    stuff.
10   Q. What do you mean just going out?
11   A. I'm -- well, I didn't go -- well, he went to school with one
12   of my cousins. So that's how. And he used to be with one of my
13   cousins.
14   Q. Okay. So you know him from kind of a dating relationship of
15   family.
16   A. Yes, ma'am.
17   Q. All right. You said that when Mr. Jefferson went up to the
18   business, the white truck was put in reverse; is that correct?
19   A. No. The truck was just parked.
20   Q. Okay. I'm sorry. When was the white truck put in reverse?
21   A. Okay. They gave him time enough to get out the car. And
22   when Jennifer entered in her car, they gave her time enough to
23   sit down. And when Jefferson -- when Wendall Jefferson was
24   walking towards his car, when he was walking towards his car --
25   Q. What was his car again?

66

1    A. The Impala. The Impala.
2    Q. Okay. He was walking towards the same car he had gotten out
3    of.
4    A. No. His car was across the street in the parking lot.
5    Q. In the same parking lot?
6    A. No. Where the first arrow was, that was where the burgundy
7    Impala was.
8    Q. Okay.
9    A. Okay. Then across where the sign is is a parking --
10   Q. Okay. Where the grass on the right-hand side?
11   A. Uh-huh. It's a -- he was walking toward his car.
12   Q. And that's when they approached him?
13   A. Uh-huh.
14   Q. Okay. And you said they put the truck in -- the white truck
15   in reverse.
16   A. Uh-huh. They gave him time enough to get in the car. As
17   soon as she got in the car, he had then started up and then went
18   and backed -- you know, put the car in reverse and pulled around
19   her.
20   Q. Was anybody else out there?
21   A. During that time?
22   Q. Other than the people who got out of the truck, Ms. Hawk,
23   and Mr. Jefferson.
24   A. Her cousin.
25   Q. Did you know her at the time?

18 (Pages 63 to 66)

United States of America v. Wendall Jefferson                              May 29, 2003

---

67

1   A. No, ma'am, I didn't.
2   Q. Have you had an opportunity to talk with Ms. Hawk about the
3   incident out here?
4   A. No, ma'am.
5   Q. You haven't talked to her at all?
6   A. No, ma'am.
7   Q. Have you talked to Mr. Jefferson about the incident?
8   A. No, ma'am.
9   Q. Have you talked to the cousin about the incident?
10  A. No.
11  Q. You talked to Ms. Cooper about it.
12  A. Yes, ma'am.
13  Q. When was that?
14  A. She was calling me, but I didn't go to her office -- you
15  know, her office during that time. I haven't talked to her.
16  Q. So you haven't talked to Ms. Cooper about what you're
17  telling the Court here today?
18  A. Yeah. When we first went to court. When we first went to
19  court.
20  Q. When was that?
21  A. That's what I'm saying. I can't remember the date.
22  Q. Okay. And you didn't hear Ms. Hawk saying anything out
23  there at all; is that correct?
24  A. No, ma'am, I didn't.
25  Q. And you were standing right where the handicapped sign is in

---

68

1   front of Head to Toe?
2   A. Yeah. The second handicapped.
3   Q. Would that have been pretty near to where her car was,
4   within five or six feet of her car?
5   A. Yes, ma'am.
6        MS. REDMOND: Nothing further.
7        THE COURT: Any redirect?
8        MS. COOPER: No, Your Honor.
9        THE COURT: You may be excused. You may remain in the
10  courtroom or leave.
11       Next witness.
12       MS. COOPER: Your Honor, I would call Jennifer Hawk. I
13  would make a motion to the Court, Judge, to limit her testimony
14  to the issues of consent regarding the search. Ms. Hawk is a
15  defendant in the Circuit Court of Russell County on charges
16  similar in nature arising out of the same set of facts and
17  circumstances as this case.
18       MS. REDMOND: In addition, Your Honor, I might add that
19  there is a possibility that Ms. Hawk will be added to a
20  superseding indictment as a coconspirator. Yes, ma'am. I
21  thought I should tell the Court.
22       THE COURT: How sure are you that she's going to be
23  added? Do you have plans to add her?
24       MS. REDMOND: At this point, yes, ma'am, on the June
25  15th --

---

69

1        THE COURT: Well, then she shouldn't testify.
2        MS. REDMOND: -- grand jury.
3        THE COURT: She should not testify. Her counsel is not
4   here.
5        MS. COOPER: Your Honor, I represent her in Circuit
6   Court of Russell County.
7        THE COURT: But you won't be able to represent her
8   here.
9        MS. COOPER: Yes, ma'am. I understand. I just wanted
10  the Court to know that. And I did receive an advisory opinion
11  from the Bar before I undertook that.
12       THE COURT: Because you will not be able to represent
13  her here, Ms. Hawk's interests as a potential defendant in this
14  court are not protected and the Court can't permit her to
15  testify. She's a likely codefendant of Mr. Jefferson. I don't
16  know how it could be limited in a way that both protects her
17  Fifth Amendment rights and protects her Sixth Amendment rights.
18  There would always be room for counsel later to object -- that
19  is, her counsel -- and I'm not going to put -- I'm not going to
20  create that risk.
21       MS. COOPER: Based upon that, Your Honor, we would
22  rest.
23       THE COURT: Anything further from the government?
24       MS. REDMOND: No, ma'am. No further witnesses to be
25  called.

---

70

1        THE COURT: Is Government's Exhibit #1 the only exhibit
2   to be entered?
3        MS. REDMOND: Yes, ma'am.
4        MS. COOPER: Your Honor, I had labeled it, and I failed
5   to ask the Court to admit it. But if it's possible -- I guess
6   it would be repetitive, but yes.
7        THE COURT: That's fine. It's admitted.
8        THE CLERK: Court is adjourned.
9        (Proceedings concluded at 10:34 a.m.)
10                 * * * * * * * * * * *
11            COURT REPORTER'S CERTIFICATE
12       I certify that the foregoing is a correct transcript
13  from the record of proceedings in the above-entitled matter.
14       This 3rd day of June, 2003.
15
16
                    _____
                    RISA L. ENTREKIN, RDR, CRR
17                       Official Court Reporter
18
19
20
21
22
23
24
25

19 (Pages 67 to 70)