Case 3:06-cv-00060-MHT-TFM   Document 92-4   Filed 12/08/2006   Page 1 of 4
Case 3:06-cv-00060-MHT-VPM   Document 5-4   Filed 02/27/2006   Page 26 of 28

Page No. 26

1  evidence that the drugs in the business may have come
2  from the drugs in the home?
3           MS. COOPER:  To my recollection, no, it was
4  not presented.  No, sir.
5           MS. REDMOND:  No, sir, I would agree with
6  that.
7           THE COURT:  Is there any way to find that
8  out?  Did you ask the police officers these questions?
9           MS. REDMOND:  If the bags matched up in any
10 way?
11          THE COURT:  Well, no.  More broadly, was
12 there any evidence that the drugs may have been -- the
13 drugs in the business may have had any relationship to
14 the drugs at home, or come from the drugs -- is there
15 any evidence of that one way or the other, even an
16 absence of evidence?
17          MS. REDMOND:  Of course the Government's
18 contention would be that they were, in fact, selling
19 crack cocaine out of the business, which is why they
20 were doing surveillance on the business.  They had
21 several individuals who they had arrested who said
22 that they had bought from out of that business and
23 were selling on behalf of the defendant.
24          THE COURT:  Okay.  And the crack in the
25 house, they were not selling it out of the house?

Case 3:06-cv-00060-MHT-TFM   Document 92   Filed 12/08/2006   Page 2 of 4
Case 3:06-cv-00060-MHT-VPM   Document 5-4   Filed 02/27/2006   Page 27 of 28

Page No. 27

```
 1          MS. REDMOND: According to the information
 2  received from those arrested individuals, there was
 3  nothing that indicated that they were going to the
 4  house to get drugs to sell or to use.
 5          THE COURT: Anything else from Probation?
 6          THE PROBATION OFFICER:  No, Your Honor.  We
 7  rely on the case law we submitted and our arguments.
 8          THE COURT: Very good.  I'll let you know
 9  when sentencing is reset.
10          MS. COOPER:  Thank you, Your Honor.
11          THE COURT: Thank you very much.
12          MS. REDMOND: Your Honor, may I just make one
13  request?
14          THE COURT: Certainly.
15          MS. REDMOND: I will be out of the state as
16  of December 22nd.
17          THE COURT:  Let Miss Carnes know that so if
18  I inadvertently do that, she'll bring to it my
19  attention.
20          MS. REDMOND: Thank you Your Honor.
21          THE COURT: She's good at bringing things to
22  my attention.
23          You are excused.
24          (Whereupon, the proceedings were concluded.)
25
```

March, 17, 2004
Sentencing

```
 1  wit, possession of cocaine with intent to distribute
 2  cocaine." And you're saying he wasn't indicted on the
 3  cocaine aspect of that?
 4         MS. COPPER: Yes, sir, that's my
 5  understanding.
 6         MS. REDMOND: If I may, Your Honor, I
 7  disagree fundamentally, I believe, with the position
 8  of the Defense. It is the Government's contention,
 9  Your Honor, and I believe that the record is clear,
10  that there are drugs in the business in the form of
11  trace elements found in baggies in the garbage can.
12  There are drugs found outside of the business that had
13  been driven up by the defendant. It is our
14  contention, and I think the facts or the record is
15  clear, that it is the belief of the Government that
16  that business is being used or was being used at that
17  time as a launching pad.
18         That is where the drug activity took place.
19  The Court asked us, in fact, at the last time -- at
20  the last sentencing hearing whether or not we had any
21  evidence that the house was being used to sell drugs
22  and we answered no. It is the business that is being
23  used. The gun is used in furtherance of the drug
24  trafficking crimes, specifically the drugs found in
25  the car as well as in the business. The drugs are at
```

**294** (Vol. 79, No. 11)

dice showing necessary to have a defaulted claim of structural error considered could bypass that requirement by merely dressing that claim in ineffective assistance garb and asserting that prejudice must be presumed."

**No Prejudice Here.** The petitioner could not show prejudice from trial counsel's failure to object to the closure, the court decided, because he did not offer any reason to believe that the jury would have found the victim less credible had her testimony been given in front of spectators.

The petitioner maintained that, had trial counsel objected to the closure, the objection would have preserved the closure error, and the petitioner would have been able to obtain automatic reversal of his conviction on direct appeal. The court, however, pointed out that this argument focuses incorrectly on the outcome of the failure to object instead of on the outcome of the trial. Moreover, trial counsel's objection might have prompted the judge to correct the error, the court added.

"[I]t is important to remember," the court continued, "that virtually all ineffective assistance claims are litigated at the collateral attack stage, after the conviction and sentence have been upheld on direct review." It said. "To hold that the presumption of prejudice applies not only when properly preserved structural errors are raised on appeal but also when related ineffective assistance claims are raised in a collateral proceeding would diminish the difference between direct and collateral review," by "undermin[ing] the important finality and comity interests that are entitled to respect in a § 2254 proceeding, like this one."

William Mallory Kent, Jacksonville, Fla., argued for the petitioner. Kellie A. Nielan, of the Florida Attorney General's Office, Daytona Beach, Fla., argued for the state.

Full text at http://pub.bna.com/cl/041491.pdf

### Firearms

### Evidence Dealer Kept Gun in Home Didn't Prove It Furthered Drug Crime

Evidence that a drug dealer kept a sawed-off shotgun at his residence in close proximity to a price list and other conspiracy-related documents was insufficient to convict him of possessing a firearm "in furtherance of" a drug crime under 18 U.S.C. § 924(c)(1)(A) in the absence of evidence that drugs also were kept at the residence or that any dealing took place there, the U.S. Court of Appeals for the Ninth Circuit held June 2. (United States v. Rios, 9th Cir., No. 05-50000, 6/2/06).

**Nexus Requirement.** Section 924(c)(1)(A) provides that anyone "who, during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm" is subject to an additional five-year prison term.

The Ninth Circuit has previously addressed the sufficiency of evidence to convict a defendant under Section 924(c)(1)(A) in United States v. Krouse, 370 F.3d 965,

---

COURT DECISIONS

975 CrL 266 (9th Cir. 2004), and United States v. Mann, 389 F.3d 869 (9th Cir. 2004). Although the court reached different results in those cases, it established that there must be some "nexus" between the firearm and the drug-related activity.

In Krouse, the court said that evidence relevant to determining whether the defendant intended to use the firearms to "promote or facilitate" a drug crime includes "the proximity, accessibility, and strategic location of the firearms in relation to the locus of the drug activity." It concluded that the evidence established a firearms violation because five high-caliber firearms found in a room next door to one containing a large quantity of marijuana were in close proximity to the site of the drug activity.

In contrast, the court held the evidence insufficient in Mann, where firearms were found in a locked safe inside a car at a campsite. The firearms were not readily accessible from the locus of the drug activity, the court said, because the key to the safe was located in a tent used for sleeping, and not in a second tent in which a methamphetamine lab had been set up.

Significantly, the Mann court held that "mere possession of a firearm recognized as one fit for illegal activity, such as a sawed-off shotgun, does not satisfy the 'in furtherance' requirement."

**Separate Residence.** The challenge for the Ninth Circuit in this case was to apply Krouse and Mann to a gun that was found at the defendant's motel-room residence, some distance away from the apartment in which he conducted his drug-dealing activities. Although the motel room also contained a large amount of cash, a drug price list, and other conspiracy-related documents, there was no evidence that drugs were ever present there.

The government argued that the gun, the price list, and the documents, along with the fact that the defendant received several late-night visitors every week, gave rise to an inference that drug dealing took place at the motel room.

In an opinion by Judge Marsha S. Berzon, the court rejected this contention, saying it is not "unusual" to have several visitors at one's home and that it could not be inferred from the timing of their visits that they were delivering or buying drugs.

Turning to the price list, the court wrote that "[a] single document listing prices for controlled substances is not sufficient evidence that [the defendant] actually dealt drugs from his residence, as opposed to from elsewhere." Additionally, it said, the price list did not in any way support an inference that the shotgun was used in furtherance of the crime.

As to the cash, the court pointed out that the defendant "was a drug dealer, so he was likely to have a great deal of cash." Its presence in the motel room, however, did not indicate that he sold drugs there or provide proof of any connection between the drug activity and the shotgun, it said.

**Proximity.** The court also rejected the government's claim that the shotgun's proximity to the conspiracy documents provided the required nexus. Although the court noted that the documents were found in the same location as the shotgun, it said that the facts "in no way suggest that [the defendant] intended to use the firearm to protect the conspiracy documents or to intimidate others into staying away from the motel room, or other-

---

COURT DECISIONS

wise possessed the firearm to further the conspiracy." According to the court, "[n]o court of appeals has held that even close proximity between a firearm and a collateral product of a drug trafficking crime, such as preparation drug paperwork, satisfies the requisite nexus."

> "[T]he presence of a firearm in some proximity to collateral products of a drug crime but far from the locus of drug activities does not establish the requisite nexus."
>
> JUDGE MARSHA S. BERZON

As in Mann, the court found the firearm "was not readily accessible to [the defendant] when he would have been involved in drug conspiracy activities for which possession of a gun would be useful." It pointed out that the shotgun "was unloaded and hidden under a dresser in a drug-free residence that was in another part of town from the locus of the drug activities." The court concluded that "the presence of a firearm in some proximity to collateral products of a drug crime but far from the locus of drug activities does not establish the requisite nexus."

Jerry D. Whatley, Santa Barbara, Calif., represented the defendant. Andrea L. Russi, of the U.S. Attorney's Office, Los Angeles, represented the government.

Full text at http://pub.bna.com/cl/0550000.pdf

### Search and Seizure

### School Strip Search Based on Student Tip Wasn't Supported by Reasonable Suspicion

High school administrators lacked the reasonable suspicion required by the Fourth Amendment when they strip-searched a student for marijuana on the basis of a respected classmate's tip and other factors, including that their discovery of contraband cigarettes in the student's purse, the U.S. Court of Appeals for the Second Circuit held May 19. Although the U.S. Supreme Court's decision in New Jersey v. T.L.O., 469 U.S. 325 (1985), involved a search of a student's purse, the Second Circuit joined other circuits in holding that the two-part inquiry into "reasonableness" adopted in that case applies as well to school strip searches. (Phaneuf v. Fraiken, 2d Cir., No. 04-4783-cv, 5/19/06)

Before seniors departed for an off-campus class picnic, school officials conducted a pre-announced search of students' bags for security purposes. This search revealed in a student's purse a pack of cigarettes, which were prohibited on school grounds. Further, a classmate told a gym teacher that the student had told her that she planned to hide marijuana "down her pants" during the bag search.

The teacher reported the tip to the principal, who ordered the student off the bus and led her to the school nurse's office. The principal considered the tip reliable because the tipster had worked with the school's staff

as an office aide. The student denied the tip in a way that made both the principal and gym teacher believe she was lying, although neither of them testified as to what aspect of the denial was suspicious.

The principal directed the nurse to search the student's underpants. When the nurse voiced anxiety about conducting the search herself, the student's mother was summoned and told that either she could conduct the search or the police would be called. The mother complied and conducted the search in the nurse's presence. In the meantime, the principal again searched the student's purse and found the cigarettes and a lighter. No marijuana was found in the purse or on the student's person.

The student sued the board of education and school officials under 42 U.S.C. § 1983, alleging violation of Fourth Amendment rights. The district court granted summary judgment to the defendants. It held that the search was both "reasonable at its inception" and "reasonable in scope" within the meaning of T.L.O.

**Unreasonable at its Inception.** For a student search to be "justified at its inception," a school official must have "reasonable grounds for suspecting that a search will turn up evidence that the student has violated or is violating either the law or the rules of the school," the T.L.O. court said. A student search is "permissible in its scope" when the "measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of the age and sex of the student and the nature of the infraction," it added.

In an opinion by Judge Barrington D. Parker Jr., the Second Circuit agreed with the statement in Cornfield by Lewis v. Consol. High Sch. Dist., 991 F.2d 1316 (7th Cir. 1993), that "as the intrusiveness of the search of a student intensifies, so too does the standard of Fourth Amendment reasonableness." The factors cited by the defendants in this case were not sufficient to give rise to the reasonable suspicion necessary to justify the search, the Second Circuit decided. It accordingly did not have to address the second prong of the T.L.O. analysis.

**Reliability of Tip.** The Second Circuit said that the reasonableness of the search in this case, at its inception, turned on the sufficiency of the classmate's tip, either by itself or in conjunction with the other factors cited by the defendants, to create a reasonable suspicion that the student had hidden marijuana on her person. After considering those other factors—the student's possession of cigarettes, her non-drug-related disciplinary problems, the allegedly suspicious way in which she denied the accusation, and the presence of cigarettes in her purse—the court was not convinced that they added much to the reasonableness calculus.

The court said that the reliability of the classmate's tip was enhanced by its being made in at least the tipster's presence (it was unclear whether the principal was also aware) and by a known informant. But, in the court's view, the classmate's tip did not claim that she actually saw the student putting anything down her pants. Further, the classmate did not claim to have any record for the teacher's belief in the student's truthfulness, or any evidence that either the teacher or principal had previously relied on the classmate for information.

(Vol. 79, No. 11)    **295**